Alright, hear ye, hear ye, hear ye, this honorable public for the 2nd District is back in session. Pursuant to adjournment, the Honorable Robert E. McLaren presides. Please be seated. Your Honor, it's a pleasure to introduce this morning's call to order, Order No. 332, Opulence v. Civil Service Comm'n of the City of Chicago. And, the Honorable Johnson, Chief of Police. On behalf of the F1, Mr. Joseph Pozzoni. On behalf of the F1 Civil Service Comm'n, Mr. James Knippen. On behalf of Chief of Police Dr. Doncher, Mr. Patrick K. Bond. Thank you. Before we start, is Mr. Knippen and Mr. Bond going to split their time up? We would request the legal court to do that. Justice Deferred would request that we divide it into approximately equal time periods of seven and a half minutes. And, I believe that at least when I stand up here with the rest of the issues, I'll attempt to focus the issues that we believe more specifically relate to each of our clients, although we recognize there is some overlap. Okay. Very good. Thank you. Mr. Mazzone? Is it Mazzone or Mazzoni? Mazzoni. Thank you. May it please the Court? Yes. Mr. Bond, Mr. Knippen, Ms. Hitchat, and Sgt. Levine. Justice, this particular case is a fact-heavy case, not a law-heavy case. This is the termination of Sgt. Levine's seat at the counsel table for misconduct after serving for 19 years with the City of West Chicago. The case arose out of incidents which occurred in October of 2009, which inherited the moniker of movie night and resulted in a 13-count complaint being filed before the Board of Police and Fire Commissioners. As the hearing commenced and completed, most of it being done by stipulation, if you'll note from the record, we stipulated most of the interrogations in, we stipulated the testimony of Sgt. Levine's in, but there were a few witnesses that did, in fact, testify in the aggravation of litigation and in the case in chief. Of the 13 counts, the first two dealt with movie night, the third dealt with the confrontation or the contact with Officer Langland, and the rest were a combination of the same allegations, that is, truthfulness, the movie night, and Langland. As we progressed through the hearing and got to the aggravation of litigation stage, I had made several motions during the course of the hearing, a motion to vacate the sanction of termination, a motion to vacate the finding of untruthfulness, and unusually, they're unusual to cases like these, the Police and Fire Commission, after making their findings and after the aggravation and mitigation hearing, granted a motion that regarded truthfulness. This Court well knows that, and having been a police officer myself, that credibility and truthfulness is an extremely significant and serious allegation for a sworn officer. Just to clarify, there's a motion regarding the finding of untruthfulness. That's correct. Not truthfulness. Pardon me. When I say truthfulness, I meant the untruthfulness. Thank you, sir. But they didn't grant that motion to vacate any findings of untruthfulness by Sgt. Levine, after they heard him testify in the aggravation and mitigation. Now, from my perspective, and may it please this Court, 32 years I've been representing police officers almost exclusively, did the job for about 10 years myself. Termination hearings and the element of cause is something that the courts have been an evolving area. But some things are rarely apparent. There is some conduct, there is a school of conduct by police officers which simply cannot be tolerated and justifies cause for discharge. Dishonesty. There was a significant argument made by Mr. Bond about how the state's attorney will have to be notified and he can't serve as a police officer anymore. So I recognize that. But that's off the table. It's not a consideration anymore. And that was off the table before the Commission decided to discharge your claim. It was at the time. The Commission made that determination to vacate that finding before it decided to discharge it. It was simultaneous. The decision to grant my motion to vacate came at the time that they gave their decision to terminate on these other charges. So I'm not sure it happened in one session and then we came back and did another session. When the Board gave their findings, they granted my motion to vacate and then found that there was grounds for termination regardless. But once the termination, in my mind, was off the table, even in the deliberations of the Board and in the consideration of the reviewing court in DuPage County, the case took on an extremely different light. As I said at the outset, this is a fact-based case. This movie night that we talked about has been argued as taking entire shifts off the street in West Chicago for two days. Not the case. Two days? For two days, yes, sir. October 1st, 2nd of… The way you said it, it sounded like they were gone for 48 hours, and I think you meant they were gone for two hours, two days, right? That's what I mean. But the arguments have always come out that these guys were gone for their shift, and that's how the appellees have portrayed this. It was an hour and a half, two hours on each one of those nights. And the context of those movies is a sergeant who's been on the Department for 19 years who has witnessed in the past other circumstances of these types of rewards. When you look at misconduct of a police officer, you look at the motive. Is it money? Is it time off? Is it rank? Is there some gain that he's going to get from this? Sergeant Aviles' record speaks for itself. He is, according to the chief, the deputy chief, he's one of the top five ever awarded officers on that department, four meritorious bars, saving lives out of fires, stopping burglars with knives, an extremely rewarded and awarded officer for the city of West Chicago. And I think you can't consider the cost of discharge without considering the commendations and the accolades that he's received. Should we also consider the prior discipline? I was just going to go there, sir. The prior discipline that they argue is as if it occurred last week. He received three suspensions in 19 years. The first suspension was 20 years ago. The second suspension was 18 years ago. And the most recent suspension is over 10 years ago from today, eight years ago from the time of this hearing. Now, I've tried these kinds of cases before arbitrators, Jim Cox most recently, who refused to hear any evidence of good or bad more than five years old. They just kind of take that line. And I realize that there's no guideline, that there's a statute. How many citizens are there in the city of West Chicago? I couldn't tell you off the bat, 28,000, 20,000. And in terms of your argument, what are we reviewing? We're reviewing whether or not pulling that shift in to watch a movie was cause for discharge, and we're arguing the contact between Sergeant Aviles and Officer Langland was cause for discharge, and we're arguing whether or not parity dictates that Sergeant Aviles should have received a sanction something less than termination. And I'll touch on all three. What's the standard of review? I think it's clear error. Because of the questions of fact and law, I think clear error is the standard review, not manifest weight. When you say clear error, what do you mean, manifestly erroneous? Manifestly erroneous, clear error, or are you talking about de novo review? Sir, I think it's probably a de novo review. Because of the mixture of the facts, you know, the question is, is it cause for discharge? We're here because we don't think he should have been discharged. We thought the circuit court should have reversed that discharge and remanded it back for some sanction other than termination. When Sergeant Aviles is in court. Counselor, could I interrupt? I have a question. Yes, sir. You said something earlier that cause is evolving. Did you not? Yes, sir. Okay. When you say evolving, you mean it's moving from one position to another. Can you tell me how it is evolving? Sir, I would tell you that in the last 20 years, starting maybe 10 years ago, you rarely saw officers being discharged for untruthfulness. They received sanctions but not discharged. In the last 5 or 10 years, because of certain cases that have come out and discovery rules and defense attorneys now obtaining the disciplinary records of police officers, findings of untruthfulness have hurt the ability of a police officer to testify in court. It certainly has evolved in that direction. But I argue to you that that is not a consideration here because truthfulness is no longer a part of the grounds for Sergeant Aviles' termination. Okay. So is it fair to say that termination for cause in the factual scenario here hasn't evolved? This is basically the same criteria that might prevail in prior cases? No, sir. I don't think it is. And that's why we're here. What he did, how he did it, and taking into consideration the entire environment of his career with that department, this does not amount to cause for discharge. Well, he was also part of the cause for discharge. It was also that he accused two subordinate officers of ratting him out. Well, sir, if you read the record, even that is contested by the officers themselves. Again, what's the standard of review for those factual findings? Clear error. We think it was clear error for the board to find that Sergeant Aviles should be terminated for cause. We think that's error. It's not a manifest weight argument, although he contested the allegation that he accused the subordinates of ratting him out, and the commission found against him, correct? That's correct. That's correct. You're saying that the record does not support that finding regardless of what standard we apply? That is correct, sir. I think that this – and I'll address those set of facts now also. The event occurs on October 1st and October 2nd of 2009. The investigation doesn't commence for over a month later, November 9th, I believe, of that same month. Nothing was done to hide what occurred that night. It was not – people weren't sworn to secrecy, and it's obvious that if a sergeant's going to pull a shift for some illicit, illegitimate reason, the first thing you do is find somebody's basement to show this movie in. He wouldn't do it in a lobby or a training room of the police department where others are going through. There's microphones and videos wherever they placed him over there. Then why would he be angry, or why would the officers claim that he was angry for ratting him out if, in fact, the logic of your statements boiled water? Sir, Sergeant Aviles wasn't angry. Sergeant Aviles had several contacts – conducts – contacts, pardon me. The board called this a self-initiated internal investigation. I'm not sure if Mr. Knippen coined that phrase or if the board actually coined that phrase. But that would entail that Sergeant Aviles was questioning these officers to find out what they said, when they said it, and that wasn't the case. When Sergeant Aviles testified, he was more hurt than anything else. He was going to these officers, and if you follow this line, he was going to these officers to say, Guys, I did this for you. If you're upset with this thing, just let me know. You don't have to go over my head. Langland especially. The first contact with Langland was in a lunchroom. Sergeant Aviles was there. Sergeant Aviles. And they claimed that he intimidated, because a charge is not self-initiated internal investigation. It was the intimidation of Officer Langland, who was about seven or eight inches taller than Sergeant Aviles. The first contact was not Sergeant Aviles seeking out Officer Langland. They met in the lunchroom. They sat down. Langland says he was called a rat. He testified that maybe I am a rat. One officer said, well, if he just said that he tattled on me, that wouldn't be so bad. But he said the word rat, well, now I feel pretty bad about that. This is the police department. These are all big boys. They deal with each other on a daily basis over a number of issues. But it's the second contact between Langland and Aviles. Officer Langland is angry, and he testified. He confronted Sergeant Aviles in the locker room and said, why are you saying these things about me? And they had a conversation. And the result of that conversation was Officer Langland testifying, I was OK with it afterwards. And it was testimony that subsequent to this whole investigation starting, Sergeant Aviles didn't change his manner. He didn't single anyone out. Several officers testified he doesn't use profanity. The chief and the deputy chief found him to be not an intimidating or a demanding or a confrontational type of person. When you listen in the aggregation and mitigation, pardon me, Anna, what am I listening to? You keep talking about intimidation, and I thought the commission found that the violation was one of the code of conduct in that he was not respectful or courteous or civil to a subordinate. I think the intimidation seems to be taking on a life of its own. Well, so did the self-initiated, self-originated investigation. But of the 13 counts, sir, counts 6 through 13 all have a Langland confrontation. However you want to describe that, it wasn't the confrontation. The testimony was very clear. Langland was in the second contact with Sergeant Aviles. Langland confronted the sergeant. And they worked together for a week and a half or two weeks afterwards without a problem. What about the first confrontation, if we're going to call it that? Are you saying that it was against the manifest way of the evidence for the board to find that that was not a respectful or courteous or civil comment that your client made to us or Langland? Mr. Justice, I would tell you that in the context of the evidence, yes, that's exactly what I'm arguing. Because in the context of the evidence, several officers testified they never heard the word rat. This was, again, something that if Langland has a bone to pick in,  Langland was the only one who said I never want to work with Sergeant Aviles again. As a matter of fact, I would consider leaving this department before working with Sergeant Aviles again. That was his testimony. Rather self-serving, I thought, but not corroborated or supported by anyone, anyone. But when you try to define a moment, and I know that cause for discharge can be a single event, but the event typically is something that's really egregious and shocks the conscience. In this particular case, the motivation of this sergeant was to reward his shift. It was done on a rainy night, on a midnight shift in West Chicago. There were, in fact, no calls for service. Although that is not a complete defense, it is also undercut in the evidence by numerous testifying officers that this was done routinely in the past, from the Chief's Barbecue 20 years prior to World Series. The Chief's Barbecue involved a situation where the Chief had officers come in during their shift, but other officers were out on patrol. In other words, it was structured so that the city was still patrolled, correct? Mr. Justice, on one occasion the Chief testified that only one officer came there on his lunchtime, and on a second occasion in cross-examination, he said it might have been two or more. Now, this is West Chicago. A full shift 20 years ago might have been two or three officers. So if you have one officer versus three on the street, in anything less than a full shift, we know how police departments work. You stagger your lunches. One person takes lunch at a time. These comments made by the other officers were a full shift being pulled out to watch a Super Bowl or a World Series, and no one seemed to pay attention to that. The Police and Fire Commission didn't seem to recognize that, and the circuit court didn't even give a comment. And the next most important argument is every officer, every officer that was interrogated, the interrogation began with, you are not the subject of this interrogation. Every officer, and they weren't ordered to watch this movie, every officer violated the same rules and regulations as the sergeant did, because most of the same rules and regulations, by disregarding the shift, coming in off, spending more time in the station. Was there at least someone who was off and, therefore, if they were interrogated, that really wouldn't apply to them because they hadn't been there? All of these officers were there, sir. Pardon? All except Langland attended those movies. Every single one except Langland. He was the one who excused himself for the second night. And I'm not going to justify that this was a logical thing to do. But in the context of his career, having watched a chief and a command staff apparently condone conduct, because there's no rule that says when you reward a shift you can pull them off, but it was common knowledge. It was common knowledge for officers, more than just one officer, to leave a shift and enjoy a steak lunch with a supervisor, to enjoy a Super Bowl or a World Series or other main events. This is West Chicago. This is how they do business, at least up until this point, it was done that way. Having been on a small department 40 years ago, it wasn't unusual on a midnight shift to come into the station and, you know, exchange greetings or whatever you want, but you weren't doing police work. But the mentality and the record shows that even in making this reward, Sergeant Wheeler attempted to show movies, Hollywood movies, that dealt with police corruption. And several of the officers testified that subsequent to the movie, there were discussions about the movie. What did they do right? What did they do wrong? What pitfalls? What leads officers to do things like this? They weren't training films. I'm not here to argue that they were training films. My recollection was that Mr. Wheeler indicated that if there were a call, he would go out while the men stayed and watched. Is that correct or not? It was—I don't know if it was that clear. Certainly on the second night with the second movie, he didn't even watch it. He was on the street doing his thing. But the context of this, sir, was to reward officers for doing a good job. Well, my point was if he said that he would go out if there was a call, was there a call? No, sir. There was not. And on the second night, he kind of got caught up. His officers got an inch so he took a foot. He wasn't strong enough to resist them. So that second night was accomplished, again, with an hour and a half with no calls and two successive rainy nights in West Chicago. Well, I do think that—and I would have— You're not suggesting that policing is unnecessary unless you get a call, are you? Absolutely not. That it's important that communities be served by the officers who are being paid by the taxpayers to watch out for them while they sleep. Yes, sir. Yes, sir, I am. Again, I've done it. I know what the responsibilities are, and I would never diminish those responsibilities. But I really need you to look at why these other officers weren't disciplined at all. They weren't reprimanded. They weren't counseled. They weren't suspended. And they did the exact same thing. Any one of them, like Langland, could have walked out of the movies and said, What are you, crazy? This is nuts. I've got a job to do out there. And I think that parody argument is an extremely strong argument. And I think that the Police and Fire Commission ignored it, as they did the prior acts of these movies and Super Bowls and those kinds of things. And I think the Circuit Court completely ignored the parody argument. Are you arguing selective enforcement? Is that what you're saying, sir? Mr. Justice, I think that the cases indicate that when conduct arises out of the same incident, there is an expectation that the officers will be treated fairly and consistently. And I think this was selective enforcement. I think they could easily, I mean, even Langland testified, I knew I had an obligation to report in this condo, and I didn't. And he didn't. And neither did any of the other six or seven or eight officers that were involved in this. No one went and said, This sergeant is crazy. He just showed us a movie, and I'm here to tell you, you better watch your midnight shift. But then you look at Sergeant Felix, and I think that also is necessary. This is a 19-year veteran, and a testimony of his peers and his command staff was that he was significantly involved in the community. Did he commit? Do you have any other questions? Time ran out about five minutes ago. I'm sorry. I gave you extra time because you were on a roll. Mr. Justice, thank you, and I'll wait for my two minutes. May it please the court, Mr. Bond, Chief Perez, Mr. Mazzoli. There are several issues that were addressed that I believe are, I guess, in my wheelhouse with regard to the issues before the court today, so I will attempt to focus on some of those at this point. First is the standard review in this case. I think there's been a mischaracterization of the standard review by counsel on behalf of the appellant, and it's based upon a misreading of Reichert and City of Belvedere. This is a manifest way to the evidence review with regard to the factual findings of the commission. The de novo portion of the review comes into effect when the commission is interpreting a law or a statute. One of the things you'll note in this particular case with regard to the argument that's been made by the appellant is they haven't identified for you what law they say was part of the interpretation or the analysis that makes this subject to that portion of the review, and as a consequence, I don't think that that is applicable in this case. If, however, there is a statute or an ordinance involved, as there was in Belvedere, which was the Illinois Labor Relations Board Act, or in the alternative in Reichert where it was a question of whether or not a conviction for a federal business offense would make the officer subsequently impeachable when he testified when he was under oath, those are completely different issues than the issues you have before you today because if the analysis that's being proposed by Mr. Rizzoni was correct, there would never be a manifest weight of the evidence issue where there was an application of rules of misconduct or a standard for discharges as set forth by the common law in this state in any of these cases. It wouldn't exist. Everything would be denotable. So this is a mischaracterization. This is a manifest weight of the evidence case as it relates to the facts. He even admits in the preliminary portion of his argument that this is primarily an issue associated with the facts of this case. When those facts are put in to judge with the code of conduct, which could theoretically be the law, does that translate then to the court or the commission's finding to a clearly erroneous standard based upon their finding of a violation of the code of conduct? It could, but I would suggest to you in this case, Justice Burke, that if you apply that analysis in this circumstance, and it hasn't been argued, we were unaware coming in today what they were saying was the law that makes this subject to a different standard of review than the manifest weight of the evidence. But if you assume that, in this particular case, whichever of the two standards you use, it has been satisfied by the evidence and the determination of the commission. One of the things that you ask Mr. Mazzoni in argument that I think is absolutely evident and clear is what the finding of the commission was with regard to the issues associated with Officer Langevin. If you look at paragraphs 8, 9, and 10 of the findings, which are at page A5 of the record in this case, the commission finds as follows, that he was guilty of conduct towards, and I'm going to shorten this up a little bit, I'm not putting the sections in, but he was guilty of conduct towards the severity and support of an officer's section in the context of the manner in which he asked whether Langevin had ratted him out because it was not respectful, courteous, or civil, and because Sergeant Aviles' comments were intimidating. And the reason they were intimidating, according to the commission, and what I think is just absolutely being glossed over in all aspects of the argument in the brief of this case, is this man was a sergeant. He serves in a superior capacity and a role. His relationship is different in many respects than the relationships between police officers on the street. He is part of command staff. That has been ignored in this argument in this brief, and it's extremely significant when looking at what happened in this case and the totality of the circumstances. Why would a reasonable commission conclude, based on that evidence, that this constituted conduct that was discourteous, uncivil, unrespectful, and intimidating? Four basic common-sense points of view that lead to that conclusion. Number one, the term ratted out. There's a recognition when that statement is made. Let's assume the commission's findings are their findings. How about the argument that, regardless of those findings, that that is not cause for discharge because of the sergeant's exemplary record and the de minimis nature of the conduct in light of the history of West Chicago and the chief, former chief, approving similar types of events? Firstly, I wouldn't say that there's been an apples-to-apples proof in this case that those were similar types of events. As has previously been noted, there is no evidence that entire shifts were taken off the street, and it's two shifts for two to two-and-a-half hours, two days in a row. There has been no allegation in this case, or argument in this case, that they were taken off for the entire night shift. Two shifts, two nights in a row, two to two-and-a-half hours. So that is a very, very different situation. That is, if you recognize the testimony of the witnesses, that you essentially had people coming in, but you did not deprive the citizens of all patrols on the street at the time. Secondly, what you have to do, I believe, in this case, is you look at the totality of the case. You don't isolate pieces of this case, which is what I think is being done in this argument. You look at the underlying misconduct. How do we know that the misconduct associated with the ratting out was problematic internally in the department in terms of morale? All you have to do is read the record and see exactly what was going on. It caused immense turmoil within the department, turmoil which he should have recognized as a superior officer was problematic, comparable to prior situations in which he did self-initiate investigations and he had been disciplined for. So this is the third time that Sergeant Aviles has committed this type of misconduct. So you look at that fact. You look at the fact that he deprived the citizens of West Chicago of what those police officers were being paid to do. Taxpayers do not pay public employees to watch movies, regardless of what your good motivation is with regard to that. It is simply inappropriate and any taxpayer would look at that and say, this is wrong, wrong, wrong. Combine that with then what I do consider to be a self-initiated investigation subsequently that undermines the morale and the command structure of the department because you have all of these different officers involved in this question of who ratted him out, what happened? That is initiated by Sergeant Aviles in this case. And you represent the commission, do you not? Yes, I do. And would you rationalize the termination for cause? Termination for cause in this case, I think, can be based independently on the movie night. However, the rationalization for the termination of cause is the totality of the case. And that includes the misconduct associated with movie night, the discourteous behavior, and all of the other charges related to the self-initiated investigation, accusing him of ratting out, and the prior disciplinary record. You cannot isolate those things from one another. This argument that they only consider five years, that could very well be based on the contents of a collective bargaining agreement, which we now see does contain those types of provisions, that you will only consider those things over five years. I don't know what was happening there, but I don't think that that's appropriately before this court. It is whether or not, based upon the standard for discharge set forth in the law, this commission had grounds which were not arbitrary or unreasonable, and which were related to the duties of service to justify the discharge of Sergeant Willis. What about his comment, or his adoption of my observation that it sounded like his argument was selective enforcement? I do not believe that selective enforcement is argued in this brief in the classic way that it would be argued. I do not believe this issue is before the court, and I believe, therefore, it is weighed. However, if I had to respond to that, Justice McClaren, my response would be, and what they're expected to do, and their conduct. And that is a major distinction with regard to the conduct of Sergeant Willis in the case. He was a sergeant. He was to be a leader of men. He was to provide the guidance to these people to do their job and do it correctly. It's not selective enforcement. You've got a completely different position here that needs to be recognized. Thank you. Thank you very much. Good morning, Justices. In police accord, Counselor Mr. Aviles, I'm also present with Police Chief Laz Perez and City Administrator Michael Gutman. I'm here on behalf of the police chief, the individual who initiated the determination. Could you respond to this issue, then, regarding Mr. Knippen's argument was that the plaintiff deprived the citizens of Washtenaw and the services of basically the police department during this time period. Therefore, the individual officers also deprived the citizens of their service that they should have been out on the street conducting the police business during that period of time, or those periods of time during those two days. Your client, then Chief Gatcher, did not seek any type of disciplinary action against any of those officers, correct? That's not correct. In fact, there was, and before the conclusion of this hearing, that wasn't. The initial investigation was to find out what the facts are once it became apparent that the sergeant, the shift supervisor, was the one responsible. The focus was on there. There was other discipline meted out to the other individuals that were involved in it. I agree, everyone should be held accountable, but when you look at the culpability, this is a shift supervisor. This is the individual who was responsible for supervising these men. He's responsible for giving these individuals the assignments. He's responsible for ensuring that they're doing their job. Is there anything in the record that would indicate what you just responded to relative to other discipline of other officers? That came after the conclusion of this hearing. Is it a public record that we can take judicial notice of? The Chief's hearing indicated it. Was it the board? It was not. It doesn't rise to the level where statutorily it would need to go to the board. That would be an internal. The fact that there's internal discipline would not necessarily be reflected in these proceedings regardless. That's correct. It's not a public record. That argument was not made by Sergeant Velas. Right, and it's not a public record, and again, that had not been concluded. But I think the key in this instance was he was the supervisor, and to say, well, there were no calls. I have a 17-year-old son who sits in the basement, and if he's getting in trouble and I'm upstairs and I don't hear about it, does that mean he didn't get in trouble? No, it means I just wasn't aware of it. And who among us in this courtroom hasn't driven by and seen a squad car, no offense, Chief Perez, and you tap your brakes or at least check your speedometer, there is a deterrent effect of having the police out there. It doesn't mean nothing happened. Fortunately, nothing major happened. But was a drunk driving through West Chicago and ended up in another town? We don't know. We would have known had they been out there. But Chief Sergeant Velas... Well, you wouldn't have known necessarily even if they were out there, to be honest. Well, that may be true. But the purpose of it... The chance of probability might increase slightly if they were out there. And there's certainly a deterrent effect that by having the police officers patrolling to make sure that there isn't anything, and if anybody has some intentions or designs on doing that, they're not going to if they see that police presence. This was a situation which, and I think the record shows that, you know, Sergeant Velas boasted, on the Red Box of movies, he held up a movie, for those of you not familiar, Red Box is in front of every jewel and whatever. He was going to do it. He did it on multiple occasions. He would have done it again. And the difference, factually there's differences between the length of these barbecues, one of which happened 19 years ago, by the way. Others happened on holidays and so forth. The entire shift never came in, and it was sanctioned. Didn't your client, Chief Gonsher, testify that the totality of the circumstances was such that the officer's status as a supervisor was compromised, and that he couldn't really serve any longer as a police officer based upon what transpired? Absolutely. Well, didn't the officer offer to resign his position as sergeant? He did. He did not offer to resign as a police officer. That's correct. So tell me what your client said relative to why he should not have been reduced or have been allowed to resign from sergeant and allowed to remain as a police officer. Well, a couple of issues. And Mr. Mazzoni said that the issue of untruthfulness is off the table, and that's not true. If you look at the findings, now the commission came back and made a specific finding on the truthfulness. They found that Sergeant Aviles did not understand or appreciate that his statements would be taken as untrue. I'm not sure I'd rather be called a liar or not know that I'm lying. I'm not sure that either one of those is better than the other, particularly when you're in law enforcement. You can't unknowingly lie because a lie is knowledge that the statement you're making is false. Correct. So what you've said sounds either like an oxymoron or a paradox. I'm not sure which. And these aren't my words. These are the words that I understand. And I agree with Justice. I don't see a distinction. And I think that was a concern that the police chief had. One of the other concerns that the chief had was, you know, this whole thing about ratting out. Ratting out in the context of any context is bad, but in the context of the police, to have a rat among you is really a bad thing. And what it did is it compromised the morale to the point where he did not believe that he could perform those jobs with the support. This is a paramilitary organization. You have to have a chain of command up and a chain of command down. You have to have the guy on either side of you has to have your back. That's how they work, and it has to be instant. You can't guess whether or not he's going to be there for you because you ratted him out or because he had to take a demotion as a result of it. You have to have that seamless paramilitary mentality. Does the board have the authority to reduce it in rank? I don't believe they do. My only question was, it's suspension or termination. Or termination. And that's predicated upon? Or no penalty at all. Correct. It was predicated on state statute. They could have suspended him for 30 days. They could have terminated him, or they could have found that the evidence did not support the chief's charges and taken no discipline whatsoever. And in that instance, suspension of 30 days would have been meaningless. He had 11 previous incidents of discipline. A three-day suspension where he had a reserve officer from another department. He let drive a vehicle, got in an accident. He had a five-day suspension that resulted in his going out and, you know, wrongfully entering the home of his ex-wife for the benefit of his kids. He had a 14-day suspension thereafter because he conducted his own internal or his own investigation over his dog. And this is not, you know, conducting his own investigations was not something that was new to Mr. Aviles. He had done that. He had taken it upon himself to do that. If you wanted an investigation, there's a protocol. All he does is say, chief, or whoever he reports to, I'd like to investigate this, I'd like to be part of this. The chief takes the control of the operation. He determines who's most appropriate to do what investigations. And the other thing about this movie night, there were other rewards that were provided. There was testimony that Mr. Aviles provided plaques and some other things. And people came in periodically for chili or somebody would buy sandwiches at lunchtime. They weren't taking an entire shift off of the streets. And it was sanctioned. It was a sanctioned event, so everybody knew about it. In the event that there was a call that came in, that would be addressed. Here in this instance, boldly on two separate occasions and but for the fact that this other officer said, I'm not participating. I'm going out and doing my job, the job I'm getting paid for. This may have gone on multiple times. It's a disservice to the citizens. The police are there to serve and protect. They can't serve and protect when they're sitting in a room watching a full-length feature Hollywood film unrelated to any police training, sitting eating popcorn and having their drinks and eating White Castle sliders. That's a disservice. And that does affect the efficiency and operation of that department. It affects the efficiency and operation of what the citizens are entitled to. Thank you. Thank you. Thank you for the last couple minutes here. You know, I'd like to use a Joe Pesci argument here, but you're hearing the same thing. What they're arguing to you, these standards that there are. Like Cousin Vinnie, or is there some other argument that I'm not aware of? It's the Cousin Vinnie, Mr. Justice. You know, to take this discipline and say 14 incidents, these are reprimands. The chief who thought he should be fired for the October incidents had every opportunity since 19 or since 2002 when he got it, 2001 when he got his 14-day suspension, escalate any act of misconduct thereafter determination, saw it not. I think the most telling part here may please this court is the testimony of the deputy chief and the chief in the aggravation and mitigation stages. They didn't say anything bad about this guy. They said he was a good cop. They said he was awarded many awards, not just the four meritorious bars. And then the chief who testified, I made a decision to terminate him, didn't review his evaluations, didn't review his commendations. You're taking away a man's career, and you're supposed to take those things into consideration before you make a decision, not afterwards. The parody argument, there is absolutely no evidence that anything happened to any of these officers. And for him to have this self-serving statement, just like a self-serving statement, there's no evidence that the whole shift was taken off. There is. There were at least three officers who testified, and entire shifts came in to watch World Series or Super Bowls. And I don't know how that's sanctioned. I don't know if there's a general order in West Chicago that says you can't come off the street unless there's a Super Bowl on TV, and then you can't. But there's evidence on those specific incidents to the contrary also. And so it's really up to the board as the fact finder to decide what's true. Mr. Justice, with all due respect, I don't think there was any contrary evidence. I don't think these officers said, I think only one. They said entire shifts went out to lunch. They said entire shifts went to watch these games. Entire shifts were the words that they used in their testimony. And it's unrebutted. The only thing he said was, well, I remember a barbecue back that I went to back in 1992, and, well, there was one guy there, and there might have been two guys there. You know, whether one person is pulled off the street, whether three persons are pulled off the street, it's the knowledge that Sergeant Avita's had in his supervisory role. It was allowed. It was done on a regular basis. And by regular, I mean multiple times. And there is absolutely nothing in the evidence where the chief ever gave a directive saying, you know, I just found out all that you guys watch the Super Bowl. That will not be allowed here and after to the supervisors. Was it in the record that the chief consulted with his command staff before the charges were filed? You know, I don't think he did. I think there was a specific statement by the chief. I think there was a specific statement by the chief that he did not consult with his command staff on any comments that they wrote in the sergeant's evaluations, which were all exemplary. And there's an argument by the village saying that he had all these problems. Whenever a problem was set forth in an evaluation, they picked it out. What they didn't pick out was two or three evaluations later or the next evaluation, it was corrected. This was a guy who loved his job. His testimony started off with, I've always wanted to be a police officer in West Chicago, and I've accomplished my goal. This is all I've ever wanted to do. This is not somebody who is intentionally going out there and jeopardizing everything that he has. Five kids, 43 years old. This is not the day and time to go out there and do something that is not hidden. Again, another aspect, nothing was hidden. Took the department a month to start investigating this. What happened to these officers? And every single one of them in the record said, you are not the subject of this investigation. Would you agree with counsel's point that making sure that there are officers on the street is part of the service of a police officer, that it is directly related to the duties and responsibilities of a sworn police officer? Yes, sir, I do. And I would add to that, it is also responsibility. The argument is then that the board's decision was unreasonable in light of this prior history you're talking about. Yes, sir. And just let me add this to you. It's also his responsibility to have officers on the street who are doing something. And I've always been a believer that you get more with a high morale than with fear. And this reward system was started because he had a significantly motivated, productive midnight shift. And that's a difficult thing to come by. Again, in my experience, representing the departments that I do. Let me ask you this to follow up on Justice Lippett's question. Let's assume for a second that the findings that your client violated the code of conduct by having movie nights and his contact with the subordinate are not against the manifesto of the evidence or not corollary or erroneous. Let's just assume that for a second. Yes, sir. I mean, based upon the options available to the commission, do nothing, 30-day suspension, termination. Your argument is that termination is arbitrary and unreasonable under these circumstances. That is correct. Even in light of the fact that there were three prior suspensions, albeit so many years ago. They could have easily given him that 30-day suspension and it would have served the same purpose. But, sir, when we had significant discussions about the hands being tied on the board, we offered the resignation as a supervisor. As a compromise. As something that would accomplish the one fear expressed by the chief of the supervisory abilities of Sergeant Vives. We offered that without any restrictions. What fact does that play with us now? Because, I mean, we're reviewing the commission's findings. We're not reviewing the circuit court. We're not reviewing their plea bargaining or whatever you want to call it. You know, I mean, that doesn't really affect what we're hearing. Sir, I think that based upon the statute, if you find, and there's two requests I would have from him. The first would simply be reversed if you found it was against the manifest way. The second is to remand him back to that board for a sanction other than termination, which would give him that 30-day suspension and put him back to work. Now, if he works out a resignation or a demotion or, you know, something in the interim or subsequent to those orders, it can still be accomplished. But the point of fact is, does what he did amount to enough misconduct, enough serious misconduct with bad intent to subject the people of the village of Wishing? It doesn't require bad intent if it's a violation of the code of conduct and the board finds that it warrants termination. His intent is irrelevant, isn't it? I don't believe so. I don't think he can divorce what he did from his experience. Sergeants don't go to sergeant school. It's an on-the-job training, and he watched other supervisors do this with other shifts, on various shifts, not just the very midnight guys, but the day shift as well. And this was something, and regarding rewards, it's in the record that he had gone to the chief and said, I'd like to have officer of the month for my midnight shift to reward them. That was turned down. So there was an intent by him. This is a motivated sergeant. If you just read his history, I don't think Mulalova's intent is necessary. His conduct speaks for itself. But I think that his intent as to why he did this, again, did he go to somebody's basement, show the movie, swear on the secrecy and say, boys, let's just forget our jobs here. His goal in this particular circumstance was to make sure that when these guys went back out to the streets, they were invigorated. They were going to work for the city of West Chicago. They were going to do extra above and beyond the call, which is why they got that reward in the first place. Mr. Mazzone, was the resignation made by your client an offer, or was it an actual resignation as sergeant? Sir, it was a signed resignation. As sergeant. Pardon me, from the rank of sergeant. He submitted a resignation. Yes, sir, he did. It was unconditional. Unconditional. So from that point forward, was the commission supposed to be determining whether or not they were firing or terminating a sergeant or a patrolman? Well, I guess that's a good question because the only charge that related to his sergeant status was the contact that he had with Langland. Everything else doesn't relate to rank. So first of all, the resignation wasn't accepted. So, no, sir, when they actually deliberated, they were deliberating him at the rank of sergeant. Do you have folks have any other questions? I have a question of Mr. Knitman. Would you please stand up? Is it your understanding that this was an unconditional resignation from sergeant to patrolman? My recollection of it, and I read it, was that it was conditional. Do you have a copy of it? Not with me today, but I could certainly provide it if it's necessary. But because it was part of what I would characterize as a sum of negotiations, we didn't believe that it was legally appropriate to be considered at this point. But my recollection was conditional. It was, I will resign as sergeant so long as I am not terminated. That is correct. I stand corrected. I just consulted with someone who reviewed the record. It was a conditional resignation. Okay. Well, that solves some of the complexities of the conundrum that I was creating in my own mind. Okay. Thank you very much. The case will be taken under advisement and hopefully at disposition later. Thank you. Court's adjourned.